**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Judy Joann Johnson,

    Plaintiff,

v.

Kilolo Kijakazi,
*Acting Commissioner of Social Security*,

    Defendant.

Case No. 20-cv-504 (ECT/DTS)

**REPORT AND RECOMMENDATION**

Plaintiff Judy Johnson appeals the Commissioner of Social Security's denial of her application for supplemental security income (SSI) benefits under Title XVI of the Social Security Act. Pl.'s Mem. 1, Dkt. No. 18. Johnson filed for benefits in 2016. *Id.* at 2. Her claim was denied initially, on reconsideration, and before an administrative law judge (ALJ). *Id.* She contends the ALJ erred by (1) ignoring evidence that conflicted with her opinion, (2) not fully analyzing obesity as an impairment, and (3) not giving appropriate weight to medical opinion evidence. *Id.* at 12–16. Because the record contains substantial evidence to support the ALJ's conclusion that Johnson does not meet the criteria for SSI benefits, the ALJ's decision should be upheld.

**FINDINGS OF FACT**

**I.  Johnson's Medical History**

Johnson is fifty-four years old and was fifty at the onset of her alleged disability, October 1, 2009. *See* Pl.'s Mem. 5, Dkt. No. 18. She has several chronic health conditions, some of which the ALJ found to be severe and others non-severe

impairments. R. at 15–16. Only three conditions, however, are relevant to this appeal: Johnson's hip pain, obesity, and mental health.

### A.     Hip Pain

Johnson's medical records reveal that she has had bilateral antero-lateral hip pain since mid-2015. Though Johnson complained of pain bilaterally, the pain in her left hip was more pronounced and less responsive to physical therapy and conservative treatment. Her provider ordered radiographs and an ultrasound in September and November 2015, respectively, which confirmed a diagnosis of bilateral trochanteric bursitis—swelling of the fluid-filled sac near the top of the hip—and bilateral greater trochanteric pain syndrome. *See* R. at 793–94, 797–98. A 2017 MRI also revealed that Johnson had a torn acetabular labrum—the fibrocartilage structure lining the periphery of the hip socket—with some mild osteoarthritis. R. at 1132.

Providers treated Johnson's bursitis from two angles: ultrasound-guided corticosteroid injections and physical therapy. Within two years of Johnson's initial diagnosis, she received six corticosteroid injections: September 2015, November 2015, March 2016, September 2016, May 2017, and September 2017. R. at 976–77, 982–83, 986–87, 1144–46, 1341–42, 1645–46. Johnson reported that the injections provided only transient relief. *E.g.*, R. at 596, 648, 793–94, 1107, 1411, 1622, 1632. And her reports of the injection success differed with each injection. Broadly, the injections did not provide the relief Johnson desired. *E.g.*, R. at 628. With some injections she had good results; with others, however, her pain persisted. *Compare* R. at 628 (good results in right hip), *and* R. at 634 (reporting that the injections went well with complete resolution of symptoms in right hip), *and* R. at 644 ("doing great after the cortisone injections"), *with* R. at 774

2

(reporting pain in right hip returned within three weeks post-injection), *and* R. at 780 (significant pain with weightbearing activities post-injection).

Johnson also underwent physical therapy. She first attended physical therapy from October 22, 2015 to May 31, 2016.[1] During that period she attended eleven physical therapy sessions, cancelled six appointments, and 'no-showed' for five appointments. R. at 614, 760, 1502. Ultimately, the physical therapist discharged her, having met her short-term goals but not having met her long-term goals, because her attendance and participation was insufficient. R. at 614. Johnson reinitiated physical therapy with that same provider, beginning on September 23, 2016. R. at 1444–51. She attended four sessions before ending treatment on November 15, 2016.[2] She had not met her short- or long-term goals. *See* R. at 597–98. Johnson began a third course of physical therapy, this time with a different provider, on July 21, 2017. R. at 1366–73. She ended treatment on August 24, 2017 after completing four sessions. R. at 1351–73. At Johnson's request, one of her physicians also prescribed her a cane in September 2018. R. at 1216, 1219.

Johnson alleges that her hip pain interfered with performing activities of daily living. *See* R. at 46–47. She testified that she could stand for only ten to fifteen minutes before her "hip gets numb and starts aching." R. at 40. Her pain limits her to walking "about a half-a-block" and she can stand or walk for only half of an eight-hour workday. *Id.* Despite her pain, she can accomplish some household activities without limitation: she spends her days cleaning house and attending her daughter's doctors' appointments; she does

---

[1] R. at 613–16, 619–20, 628–30, 636–37, 639–40, 643–44, 646–47, 759–62, 765–66, 773–74, 782–83, 785–86, 789, 792–97, 1499–1507, 1508–19, 1540–44, 1595–1602, 1607–10, 1615–18, 1634–39.
[2] R. at 597–98, 601–03, 1413–18, 1434–51.

3

her own laundry and grocery shopping; and she independently attends to all her personal needs, such as feeding, dressing, and bathing. R. at 42–43. In completing these daily activities, however, Johnson is not without limitation. For example, though she testified that she could complete her grocery shopping, R. at 43, she does so by relying on a cane, taking frequent breaks, and leaning on the grocery cart while shopping, R. at 45–46. These limitations, however, appear to stem more from her chronic obstructive pulmonary disease (COPD) and underlying respiratory disease than her hip pain. *See* R. at 45 ("Q: Before you were using the cane, were you having any problems getting around the store? A: Yeah, with breathing.").

Despite now alleging that she requires a cane as an assistive device, R. at 38, Johnson never previously required any assistive device to ambulate or balance. Providers repeatedly noted that she attended her appointments ambulating without an assistive device.[3] Similarly, though testifying that she was limited to walking a half-a-block at a time, R. at 40, she reported to her physical therapist in 2016 that she walked five miles with her daughter, R. at 79, 615, 761, 1510, and walked all day on Memorial Day, R. at 613, 759, 1501. That said, between 2015 and 2016, providers did note that, at times, Johnson walked with an antalgic or asymmetric gait.[4] By May 2016, however, her physical therapist assessed that her hip strength had improved enough to alleviate asymmetries in her gait. R. at 1502. From then on, providers noted that Johnson's gait was normal,

---

[3] R. at 604, 621, 629, 750, 767, 775, 795, 815–16, 1368, 1417, 1448, 1516, 1555, 1637, 1726–27, 1725, 1729.
[4] *Compare* R. at 621, 629, 767, 775, 1516–17, 1555 (abnormal gait), *with* R. at 646, 741, 760, 792, 850, 1198, 1210, 1237, 1247, 1261, 1293, 1295, 1334, 1348, 1392, 1406, 1431, 1496 (normal gait).

4

steady, and coordinated through 2019—including when Johnson requested a cane.[5] Johnson's medical records nowhere suggest that she struggled to balance while standing. To the contrary, her records reveal that her balance in June 2015 was "good." R. at 815, 1726, 1729.

### B.   Obesity

Body mass index (BMI) is a statistical index that compares a ratio of individuals' weight to height. The National Institute of Health (NIH) uses BMI to categorize healthy weight classes using the following metrics:[6]

| BMI Range | Interpretation |
|---|---|
| < 16.5 kg/m$^2$ | Severely Underweight |
| 16.5 to 18.4 kg/m$^2$ | Underweight |
| 18.5 to 24.9 kg/m$^2$ | Normal Weight |
| 25.0 to 29.9 kg/m$^2$ | Overweight |
| ≥ 30.0 kg/m$^2$ | Obesity |
| 30.0 to 34.9 kg/m$^2$ | Obesity Class I |
| 35.0 to 39.9 kg/m$^2$ | Obesity Class II |
| ≥ 40.0 kg/m$^2$ | Obesity Class III |

Level II obesity correlates with a greater risk for developing obesity-related impairments but does not directly correspond with any specific degree of functional loss. R. at 20.

Johnson's medical records reflect that she has been obese since April 2013. R. at 881. She fit within the NIH's Obesity Class I when she filed for disability, but her BMI

---

[5] *E.g.*, R. at 760, 1198, 1210, 1237, 1293, 1247, 1261, 1295, 1334, 1348.
[6] NATIONAL INSTITUTE OF HEALTH, BMI CLASSIFICATION PERCENTILE AND CUT OFF POINTS (2020).

5

placed her in Obesity Class II at the ALJ hearing. Johnson's BMI has trended upward since 2011:[7]



### C. Mental Health

Johnson has an extensive mental health history. She has suffered from psychiatric conditions as both a juvenile and adult, and her history includes suicidal and homicidal ideation, self-harm, suicide attempts, and physical harm to others. Johnson's mental health diagnoses include depression, bipolar disorder, and post-traumatic stress disorder (PTSD). R. at 15.

The record includes treatment notes from three mental health providers: Michael M. Messer, M.D.; Jeannine M. Mueller-Harmon, APRN, CNP; and Marcus P. Desmonde, Psy.D., L.P. Dr. Messer was Johnson's primary psychiatrist from January 2016 to May 2018. When he retired, Johnson began seeing Mueller-Harmon, a psychiatric nurse practitioner. Dr. Desmonde, a psychologist, also evaluated Johnson in 2017 for her social

---

[7] *See* R. at 610, 631, 636, 639, 642, 646, 732, 735, 738, 741, 756, 777, 782, 788, 791, 800, 805, 821, 824, 834, 838, 844, 861, 868–69, 871, 875, 881, 889, 892, 894, 899, 901, 909, 915, 917, 1157, 1209, 1218, 1486, 1561, 1741.

security disability claim. R. at 1118–20. Johnson also sought psychiatric care from another psychologist, Julianne M. Davis, PsyD, LP, sometime during 2017, though any medical records from her care are sparce in this record. *See* R. at 1385–88.

The combined effects of Johnson's mental health diagnoses resonate throughout the record. Dr. Messer repeatedly notes the severity of Johnson's anxiety. In October 2016 Johnson could not go to the grocery store. R. at 1430. In January 2017 she was "worried all the time" and Messer documented her aversion to crowds and using public transportation. R. at 1405. Her anxiety continued through August 2017, where Messer noted that Johnson was experiencing frequent panic attacks and again mentioned her inability to tolerate crowds and use the bus. R. at 1347.

When Johnson transferred her care to Mueller-Harmon, she too noted similar concerns. Though not apparent during Johnson's initial visit with Mueller-Harmon, R. at 1284–95, the progress notes from later encounters document that Johnson was increasingly anxious, irritable, and had recent suicidal ideations. R. at 1241–64.

Dr. Desmonde's 2017 evaluation emphasizes Johnson's primary providers' findings. *See* R. at 1118–20. He noted that, at its worst, Johnson's anxiety reached an 8 or 9 on a 10-point scale. R. at 1119. He documented that she suffered from "sleep disturbance, problems with energy levels, irritability, hopelessness, crying spells and social isolation when she is at her worst. *Id.* And he highlighted that her symptoms of anxiety "are worse on 'crowded busses.'" *Id.*

Though the notes of Johnson's mental health providers reflect clinical insight to her mental health diagnoses, other parts of the record reveal the practical effect of her disorders—notably her irritability and difficulty interacting with others. In March 2011, a

7

nurse documented a phone conversation with Johnson where the nurse advised Johnson that, to refill her Lortab, she would have to schedule an appointment. R. at 923. Johnson became irate: she started yelling and screaming at the nurse, ultimately hanging up on her. *Id.* That was not the first occurrence. In a 2010 phone call with a nurse, Johnson was upset over a misunderstanding about which prescriptions her provider sent to Walgreens. R. at 946–47. She abruptly hung up on the nurse. *Id.* Johnson's anger did not surface only in telephone encounters, but also in person. In March 2011 an emergency department nurse practitioner documented that Johnson became angry after the provider questioned Johnson about her use of pain medication. R. at 926. Johnson responded by becoming angry, jumping off the bed, and storming out of the emergency room. *Id.* Likewise in October 2011 an emergency department nurse documented that Johnson was "[a]ngry and cursing from [the] onset of [the] visit." R. at 909.

As part of Johnson's disability claim, both Dr. Messer and Ms. Mueller-Harmon submitted a Medical Source Statement of Ability to do Work-Related Activities (Mental). R. at 1163, 1165–66, 1768–70. Messer and Mueller-Harmon both agreed on the following impact that Johnson's mental health diagnoses had on her ability to understand, remember, and carry out instructions:[8]

| Understand and remember short, simple instructions | Moderate |
|---|---|
| Carry out short, simple instructions | Moderate |
| Understand and remember detailed instructions | Marked |
| Carry out detailed instructions | Marked |
| The ability to make judgments on simple work-related decisions | Moderate |

---

[8] R. at 1163, 1768.

8

Moderate and Marked had these meanings:

**Moderate:** Person's functioning in this area independently, appropriately, effectively, and on a sustained basis is fair.

**Marked:** Person's functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited.

Messer and Mueller-Harmon disagreed, however, on their evaluation of how Johnson's diagnoses impaired her ability to respond appropriately to supervision, co-workers, and work pressures in a work setting:[9]

|  | Musser | Mueller-Harmon |
|---|---|---|
| Interact appropriately with the public | Mild | Marked |
| Interact appropriately with supervisor(s) | Mild | Marked |
| Interact appropriately with co-workers | Mild | Marked |
| Respond appropriately to work pressures in a usual work setting | Moderate | Moderate |
| Respond appropriately to changes in a routine work setting | Mild | Moderate |

Moderate and Marked had the same meanings as described above. And Mild meant:

**Mild:** Person's functioning in this area independently, appropriately, effectively, and on a sustained basis is slightly limited.

Together, Johnson's mental health conditions create a moderate limitation on her ability to interact with others and a mild limitation on her ability to concentrate. R. at 16–17.

## II.  Procedural Posture

Johnson filed for SSI disability benefits in October or November 2016. *Compare* R. at 13 ("On October 26, 2016, the claimant filed an application for supplemental security income"), *with* R. at 192 ("On November 10, 2016, you applied for Supplemental Security

---

[9] R. at 1165, 1769.

9

Income"), *and* Pl.'s Mem. 1, Dkt. No. 18 (same). She alleged a disability onset date of October 1, 2009.[10] Pl.'s Mem. 2. The Social Security Administration (SSA) initially denied her claim on February 23, 2017, and again upon reconsideration on June 16, 2017. *Id.* Johnson then requested a hearing on July 12, 2017, which occurred on April 30, 2019 before an ALJ[11] in Duluth, Minnesota. *Id.* The ALJ denied Johnson's claims on July 1, 2019, R. at 15–25, and on December 16, 2019, the SSA's Appeals Council denied Johnson's request for review, R. at 4–6.

## III.    ALJ Decision

The Commissioner uses a five-step sequential evaluation process to determine whether a claimant is entitled to disability benefits. 20 C.F.R. § 404.1520(a). The Commissioner evaluates "(1) whether the claimant is currently employed; (2) whether the claimant is severely impaired; (3) whether the impairment is, or approximates, a listed impairment; (4) whether the claimant can perform past relevant work; and if not, (5) whether the claimant can perform any other kind of work." *Brock v. Astrue*, 674 F.3d 1062, 1064 n.1 (8th Cir. 2012); *see also* 20 C.F.R. § 404.1520(a)(4).

The ALJ issued her decision on July 1, 2019. In steps one through three, she found Johnson had not engaged in substantial gainful activity since the alleged onset of her disability and has several severe physical and mental impairments that did not meet or medically equal any listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. at 15–16.

---

[10] At the hearing before the ALJ, Johnson amended her disability onset date to October 26, 2016. Pl.'s Mem. 2, Dkt. No. 18.
[11] The Honorable Hallie E. Larsen, Administrative Law Judge for the Office of Disability Adjudication and Review, Social Security Administration.

At step four the ALJ found Johnson had no past relevant work. R. at 23–24. The ALJ determined that since June 26, 2015 Johnson had the residual functional capacity (RFC) to perform less than the full range of light work with certain additional limitations: limited to lifting and carrying twenty pounds occasionally and ten pounds frequently; sitting throughout an 8-hour workday with normal breaks; standing or walking for six hours; using a cane with ambulation; occasional exposure to extreme cold or heat, fumes, odors, dust, gases, and poor ventilation; no climbing ladders, scaffolds, or ropes; occasional balancing, stooping, kneeling, crouching, crawling, and climbing ramps or stairs; tolerating only occasional exposure to work hazards such as unprotected heights and dangerous moving machinery; understanding, remembering, and carrying out short, simple instructions; and interacting appropriately with others on an occasional basis. R. at 17–18.

At step five the ALJ found that, given Johnson's RFC, she could perform other work in the national economy, such as small parts assembler, collator operator, or polypacker. R. at 24. For those reasons, the ALJ denied Johnson's benefits claim.

## CONCLUSIONS OF LAW

### I. Standard of Review

The Commissioner's denial of disability benefits is subject to judicial review. 42 U.S.C. §§ 405(g), 1383(c)(3). This Court has authority to "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying or reversing a decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." *Id.* § 405(g) (sentence four).

Disability under the Social Security Act means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* § 423(d)(1)(A). Under the regulations, disability means that the impairment(s) is/are so severe that the claimant is not only unable to engage in previous work, but cannot engage in any other kind of substantial gainful employment that exists in the national economy. *Id.* § 423(d)(2)(A).

This Court "must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole." *Telkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006). Substantial evidence is "less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion." *Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003). On review, the Court considers "both evidence that detracts from and evidence that supports the Commissioner's decision." *Hartfield v. Barnhart*, 384 F.3d 986, 988 (8th Cir. 2004). If it is possible, based on the evidence, to reach two inconsistent decisions, and one of those decisions is the Commissioner's position, the decision must be affirmed. *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003). In other words, the denial of benefits will not be disturbed "so long as the ALJ's decision falls within the available zone of choice. An ALJ's decision is not outside the zone of choice simply because [the reviewing court] might have reached a different conclusion had [it] been the initial trier of fact." *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008); *see Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988) ("The concept of

substantial evidence . . . embodies a zone of choice within which the Secretary may grant or deny benefits without being subject to reversal on appeal.").

## II. Analysis

Johnson contends the ALJ erred by (1) ignoring evidence that conflicted with her opinion, (2) not fully analyzing obesity as an impairment, and (3) not giving appropriate weight to medical opinion evidence. Pl.'s Mem. 12–16, Dkt. No. 18. The Court addresses each, in turn.

### A. Hip Pain

Johnson first claims that the ALJ ignored medical evidence about her hip pain; that is, that the ALJ "cherry-pick[ed] evidence in the record to support her preferred findings." *Id.* at 12. She alleges that the ALJ focused on medical records documenting that Johnson achieved her goals during her second course of physical therapy, yet ignored records which showed that the first course of physical therapy led to no change in Johnson's symptoms. *Id.* Also, that the ALJ ignored Johnson's history of chronic pain and unsuccessful injections, ignored that Johnson requested a cane for her difficulty standing, and limited the administrative decision to a cursory and misleading summary of "hip pain" to reach a light work residual functional capacity. *Id.* at 12–13.

The Commissioner, by contrast, argues that the ALJ properly considered all the evidence. Def.'s Mem. 6–7, Dkt. No. 20. For example, he asserts that the ALJ considered—or at least mentioned—both courses of Johnson's physical therapy in the decision. Similarly, that the ALJ recognized the transient relief from the injections Johnson received, but also considered that Johnson's physical exams were mostly unremarkable and Johnson reported to her providers that she was doing well. *Id.* at 7–8.

13

The Court finds that the ALJ properly considered all the evidence about Johnson's hip pain, and that evidence supports the ALJ's finding. Despite Johnson's assertion that the ALJ ignored certain evidence, the ALJ's decision reflects its consideration of that evidence. First, the ALJ did not ignore any unsuccessful results from Johnson's treatment, but, in fact, acknowledged Johnson's physical limitations and the transient or limited relief she received from the injections or physical therapy. R. at 18.

Next, the ALJ noted that many of Johnson's medical records significantly contradict her disability claim. For example, the ALJ cited records which showed that Johnson displayed no abnormal gait, had full mobility, suffered from no focal neurological deficits, and had only subtle strength deficits. R. at 19. Johnson's 2017 medical records about her gait, range of motion, strength, and neurological function all support the ALJ's RFC assessment. *E.g.*, R. at 1353, 1369–70, 1392, 1406. The ALJ's finding that Johnson's condition met the standard for a light work RFC, rather than a sedentary RFC, is supported by Johnson's providers' recommendations for only conservative courses of treatment. *Elwood v. Colvin*, No. 13-cv-1645, 2015 WL 179391, at *12 (D. Minn. Jan. 14, 2015) (discussing how conservative course of treatment undermines disability claim).

Finally, Johnson alleges that the ALJ ignored evidence that her disability required her to use a cane for ambulation and stability. She argues that she required a cane "to address her chronic hip pain while standing" and that she suffered from "difficulties in standing and walking" beginning in 2016. Pl.'s Mem. 13, Dkt. No. 18. Johnson's claim of difficulty standing is unsupported by the record, which reveals that Johnson's provider prescribed Johnson a cane—at Johnson's request—for only a mobility limitation, not astasis. The only suggestion that Johnson struggled to stand independently was a single

14

check box on Johnson's self-reported Functional Report – Adult form. There, it asked her to "Check any of the following items that [her] illnesses, injuries, or conditions affect," to which she checked the boxes for walking, stair climbing, squatting, bending, and standing. R. at 240. But even that limited reference is questionable because the form then directed Johnson to "explain how [her] illnesses, injuries, or conditions affect each item [she] checked." *Id.* She noted that "I can only walk ½ [sic] without stopping, hard time climbing stairs." *Id.* Thus, Johnson's explanation provides no support for her check-box allegation that her conditions affect her ability to stand.

Johnson's hearing testimony also contradicts her argument, where she testified that she could perform limited ambulatory personal activities, such as house cleaning or laundry. *E.g.*, R. at 43. Nowhere in that testimony did Johnson reveal that she required a cane to accomplish those activities and Johnson's ability to complete those tasks aligns with the ALJ's RFC determination.

### B. Obesity

Johnson next argues that the ALJ did not fully analyze obesity as an impairment because the ALJ did not explicitly mention obesity as a "severe or non-severe impairment in section two of the Findings of Fact and Conclusions of Law in the Decision." Pl.'s Mem. 13–14, Dkt. No. 18. Thus, Johnson believes that this "failure"—the ALJ mentioning that she considered the condition and incorporated it into the RFC but not addressing it in Section 2—means that the ALJ did not at all analyze obesity. *Id.* at 14.

A review of the ALJ's decision reveals that the ALJ considered obesity. Nothing requires the ALJ to mention a specific fact in a particular portion of the administrative decision. But contrary to Johnson's assertion, the ALJ did list obesity as one of Johnson's

15

severe impairments in section 2. R. at 15 ("The claimant has the following severe impairments: . . . obesity . . . ."). The ALJ also noted Johnson's height and weight, revealing a BMI of 32, in the discussion. R. at 18. And the ALJ devoted a full paragraph to describing Johnson's history of obesity and her BMI—specifically relating Johnson's obesity as a factor exacerbating her impairments. R. at 20.

Thus, the ALJ fully and fairly analyzed obesity as one of Johnson's impairments.

### C.    Mental Health

Finally, Johnson alleges that the ALJ did not properly consider Ms. Mueller-Harmon's medical opinion, which Johnson believes was entitled to greater weight. Pl.'s Mem. 14–15, Dkt. No. 18. The ALJ considered Mueller-Harmon's medical opinion, noting that she was not an acceptable medical source but recognizing that she did have a treating relationship with Johnson. R. at 22. The record includes a mental medical source statement that Mueller-Harmon provided and treatment notes from Johnson's visits with her. Because the ALJ found the content of the mental medical source statement to conflict with the objective observations in Mueller-Harmon's treatment notes, the ALJ afforded Mueller-Harmon's assessment little weight.

Johnson argues that Mueller-Harmon's treatment notes aligned with the mental medical sources statement because the treatment notes mention Johnson's irritability, anger, homicidal ideations, and difficulty dealing with crowds. Pl.'s Mem. 16 (citing R. at 1246, 1288–89). Johnson believes that for the ALJ to find inconsistencies, the ALJ had to disregard records from other sources, which documented Johnson's irritability and significant social impairments or inability to handle the stress and pressures of full-time employment. *Id.*

As a nurse practitioner, Mueller-Harmon was not an acceptable medical source in 2016 when Johnson filed for disability benefits. 20 C.F.R. §§ 404.1502, 404.1513 (2015); *see Blackburn v. Colvin*, 761 F.3d 853, 859 (8th Cir. 2014). Though Mueller-Harmon saw Johnson only three times, the ALJ considered her to have a treating relationship with Johnson. R. at 22. The Code of Federal Regulations directs how medical opinions should be weighed and considered. Because the ALJ correctly found that Mueller-Harmon was not an acceptable medical source, and thus did not give Mueller-Harmon's opinion controlling weight under 20 C.F.R. § 404.1527(c)(2), the ALJ's determination about how much weight to afford Mueller-Harmon's opinion is guided by the factors in 20 C.F.R. § 404.1527(c)(1)–(6). 20 C.F.R. § 404.1527(f)(1). Those factors are: the examining relationship; the treatment relationship, such as the length of treatment and frequency of examination, and the nature and extent of the treatment relationship; supportability; consistency; specialization; and other factors. 20 C.F.R. § 404.1527(c)(1)–(6).

The ALJ considered the treatment relationship between Johnson and Mueller-Harmon, ultimately finding there was a treating relationship. R. at 22. The ALJ also considered Mueller-Harmon's specialization, recognizing that she was a psychiatric provider. *Id.* But the ALJ found that the inconsistencies between the conclusions on the mental medical source statement and the treatment record outweighed those other factors. *Id.* And the ALJ noted that Johnson was present when Mueller-Harmon completed the form and influenced its content. *Id.* It is proper—and within the ALJ's zone of choice—for the ALJ to reject a treating provider's opinion if it is unsupported by that

provider's own notes or other evidence in the record,[12] and the ALJ may assign little weight to any opinion that is either internally inconsistent or conclusory.[13] The ALJ's discussion of Johnson's presence when Mueller-Harmon completed the mental medical source statement is appropriate as an "Other Factor" for the ALJ to consider under 20 C.F.R. § 404.1527(c)(6) because an ALJ may discount any opinion that heavily relies on a claimant's subjective statements. *Renstrom v. Astrue*, 680 F.3d 1057, 1064 (8th Cir. 2012).

In sum, the ALJ has broad discretion to assess various evidence and determine how much weight to afford it. This Court's role is not to reweigh that evidence but only to determine whether substantial evidence in the record as a whole supports the ALJ's conclusion. Though this Court may have weighed the evidence differently, the ALJ's decision is supported by substantial evidence in the record and must be affirmed.

## RECOMMENDATION

For these reasons, the Court recommends that:

1.     Plaintiff Judy Joann Johnson's Motion for Summary Judgment [Dkt. No. 17] be **DENIED**.

2.     Defendant Kilolo Kijakazi's Motion for Summary Judgment [Dkt. No. 19] be **GRANTED**.

---

[12] Myers v. Colvin, 721 F.3d 521, 525 (8th Cir. 2013); Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006)
[13] Chesser v. Berryhill, 858 F.3d 1161, 1164–65 (8th Cir. 2017)

3.      The decision of the ALJ be **AFFIRMED**.

Dated: July 20, 2021                              ___s/David T. Schultz_____
                                                          DAVID T. SCHULTZ
                                                          United States Magistrate Judge

**NOTICE**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to the magistrate judge's proposed findings and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. *See* Local Rule 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in Local Rule 72.2(c).